IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02198-NRN

A.R. WILFLEY & SONS, INC.,

Plaintiff and Counterclaim Defendant,

v.

FEDERAL INSURANCE COMPANY, and
UNITED STATES FIRE INSURANCE COMPANY,

Defendants and Counterclaim Plaintiffs,

and

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

Defendant.

---

**ORDER ON DEFENDANT AND COUNTERCLAIM PLAINTIFF FEDERAL
INSURANCE COMPANY'S MOTION FOR JUDGMENT ON THE PLEADINGS
(ECF NO. 70)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This case is before the Court for all purposes upon the consent of the parties,

ECF No. 58, and an Order of Reference by Chief Judge Philip A. Brimmer pursuant to

28 U.S.C. § 636(c), ECF No. 59. Now pending before the Court is Defendant and

Counterclaim Plaintiff Federal Insurance Company's ("Federal") Motion for Judgment on

the Pleadings, ECF No. 70, pursuant to Fed. R. Civ. P. 12(c), based on asserted

undisputed facts in Plaintiff and Counterclaim Defendant A.R. Wilfley & Sons Inc.'s

("Wilfley") Amended Complaint, ECF No. 34, Federal's Answer and Counterclaims, ECF

No. 44, and Wilfley's Answer to Federal's Counterclaims, ECF No. 50. Specifically,

Federal moves for judgment on the pleadings with respect to (a) all of Wilfley's claims against Federal, including Claim 5 (breach of contract), Claim 6 (declaratory relief), Claim 7 (estoppel), and Claim 8 (common law insurance bad faith); and (b) all of Federal's counterclaims against Wilfley, including Counterclaims 1 and 2 (declaratory relief) and Counterclaim 3 (monetary damages).

Wilfley filed a response to Federal's Motion for Judgment on the Pleadings, ECF No. 76, and Federal filed a reply, ECF No. 78. On March 4, 2025, the Court ordered additional briefing on certain language in the Federal policies. ECF No. 82. Federal filed its supplemental brief on March 11, 2025, ECF No. 83, and Wilfley filed its supplemental brief on March 17, 2025, ECF No. 84.

As described below, Federal's Motion for Judgment on the Pleadings, ECF No. 70, will be **GRANTED** with respect to Wilfley's Claims 5 through 8 and Federal's Counterclaims 1 and 2, and **DENIED** with respect to Federal's Counterclaim 3.

## I.    BACKGROUND

This is a complicated insurance dispute arising out of numerous asbestos bodily injury actions brought against Wilfley. For over 100 years, Wilfley has been in the business of manufacturing American-made pumps in Colorado for use in mining and industrial operations. Wilfley has approximately 150 employees, most of whom work at its facilities in Colorado. ECF No. 34 ¶ 3. Federal is a property and casualty insurance company incorporated in Indiana and authorized to do business in Colorado. *Id*. ¶ 5.

Since the 1980s, Wilfley has been named as a defendant in numerous lawsuits by individuals alleging personal or bodily injury due to exposure to asbestos in Wilfley products and other alleged sources of asbestos ("Underlying Actions"). *Id*. ¶ 12. The

Underlying Actions are continuing, and Wilfley expects new actions of this kind to be filed for years to come. *Id*. ¶ 13.

Until recently, coverage for the Underlying Actions was provided by non-party Great Northern Insurance Company under primary comprehensive general liability policies for periods covering November 1, 1999, through November 1, 2001 (the "Great Northern Primary Policies"). *Id*. ¶ 14. However, all coverage under the Great Northern Primary Policies has now been exhausted, either by payment of claims or by agreements to pay settlements in the Underlying Actions in the very near future. *Id*. ¶¶ 14–15. Wilfley also had other underlying policies besides the Great Northern Primary Policies, but it seems the insurers who issued those other policies have become insolvent. ECF Nos. 34 ¶ 37; 44 ¶ 4; 50 ¶ 4.

Federal has issued Wilfley at least five umbrella liability insurance policies (the "Federal Umbrella Policies"). The Federal Umbrella Policies provide coverage for personal injury, including asbestos injury, and cover policy periods from January 1, 1981, through January 1, 1986. The Federal Umbrella Policies provided up to $5 million in coverage per occurrence, except for the first policy, which was for $3 million. ECF No. ¶ 31.

In sum, with the exception of the Federal Umbrella Policies and an umbrella policy issued by Defendant United States Fire Insurance Company, all other policies Wilfley is aware of do not provide collectible coverage for the Underlying Actions, either because their applicable limits have been exhausted, they were issued by now insolvent insurers, they do not drop down to fill coverage gaps left by uncollectible insurance, or they contain exclusions for claims alleging asbestos bodily injury. ECF No. 34 ¶ 20.

Wilfley asserts that all of the Federal Umbrella Policies include the following standard terms:

**1.    COVERAGE**

In consideration of the payment of the required premium, the Company hereby agrees, subject to all of the terms of this policy, to pay on behalf of the insured all sums, as more fully defined by the term ultimate net loss, for which the insured shall become obligated to pay by reason of liability

(a)    imposed upon the insured by law or

(b)    assumed under contract or agreement by the insured,

arising out of personal injury, property damage or advertising liability caused by an occurrence.

**2.    UNDERLYING LIMIT–RETAINED LIMIT**

The Company shall be liable only for the ultimate net loss the excess of the greater of the insured's underlying limit or retained limit defined as:

(a)    Underlying limit – an amount equal to the limits of liability indicated beside the underlying insurance listed in the schedule of underlying insurance, plus the applicable limits of any other underlying insurance collectible by the insured;

(b)    Retained limit – The amount specified in Item 4(c) of the declarations as the result of all occurrences not covered by said underlying insurance, and which shall be borne by the insured, separately as respects each annual period of this policy.

When the retained limit has been exhausted, the policy shall apply without application of the retained limit for the remainder of that annual period.

. . .

**4.    DEFENSE PROVISIONS**

(a)    The Company shall not be called upon to assume charge of the investigation, settlement or defense of any claim made, or suit brought, or proceedings instituted against the insured, but shall have the right and be given the opportunity to be associated in the defense and trial of any such claims, suits

4

or proceedings relative to any occurrence which, in the opinion of the Company, may create liability on the part of the Company under the terms of this policy. If the Company avails itself of such right and opportunity the Company shall do so at its own expense. Court costs and interest, if incurred with the consent of the Company, shall be borne by the Company and other interested parties in proportion that each party's share of ultimate net loss bears to the total amount of ultimate net loss sustained by all interested parties. The provisions of this paragraph apply in all circumstances except as provided for in paragraph (b) below.

(b)     With respect to any occurrence not covered by the underlying policies listed in the schedule of underlying insurance, or any other underlying insurance collectible by the insured, but covered by the terms and conditions of this policy the Company shall, in addition to the amount of the ultimate net loss payable;.

1)     defend any suit against the insured seeking damages on account of personal injury, property damage or advertising liability, even if any of the allegations of the suit are groundless, false or fraudulent' and may make such investigation and settlement of any claim or suit as it deems expedient;

2)     pay all expenses incurred by the Company, all costs taxed against the insured in any such suit and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Company's liability thereon;

. . .

ECF No. 34-3 at 2–3.[1] The Federal Umbrella Policies do require, as a condition, the

"Maintenance of Underlying Insurance":

The policy or policies referred to in the attached schedule of underlying insurance or renewals or replacements thereof not more restrictive in coverage, shall be maintained in full effect during the currency of this policy,

---

[1] For ease and readability, throughout this Order, the Court has removed the bolded typeface found throughout the original text of the Federal Umbrella Policies.

except for any reduction in the aggregate limit or limits contained therein solely by payment of claims in respect to occurrences happening during the period of this policy. Failure of the insured to comply with the foregoing shall not invalidate this policy but in the event of such failure, the Company shall only be liable to the same extent as if the insured had complied with this condition.

*Id.* at 4. Another listed condition refers to "Other Insurance":

If other valid and collectible insurance with any other insurer is available to the insured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance. Nothing contained herein shall be construed to make this policy subject to the terms, conditions and limitations of other insurance.

*Id.* Also included among the conditions is a section relating to the "Payment of Ultimate Net Loss":

Coverage under this policy shall not apply unless and until the **insured**, or the insured's underlying insurer, shall be obligated to pay the amount of the underlying limit or retained limit on account of personal injury, property damage or advertising liability. When the amount of ultimate net loss has finally been determined, the Company shall promptly pay on behalf of the insured the amount of ultimate net loss falling within the terms of this policy.

The named insured shall promptly reimburse the Company for any amount within the retained limit specified in the insuring agreements paid by the Company on behalf of an insured in settlement or satisfaction of any claim or suit.

*Id.* at 4–5.

Wilfley tendered the pending underlying actions to Federal for coverage under the Federal Umbrella Policies. Federal agreed to participate in Wilfley's defense and pay indemnity costs incurred in the Underlying Actions pending resolution of *this* case, but subject to a purported full reservation of rights to discontinue coverage and to recoup amounts paid. ECF No. 34 ¶¶ 38–39; *see also* ECF No. 44-2 at 1 (letter to Wilfley dated March 4, 2024 ("Reservation of Rights Letter") stating, "Please be advised

6

that Federal will continue to defend and indemnify Wilfley against the Claims upon expiration of the Agreement and during the pendency of the coverage litigation but subject to a full and complete reservation of rights under the Policies, at law and in equity.").

Wilfley also alleges that in 2018, former defendant Brandywine Holdings Corporation ("Brandywine")[2] assured Wilfley that Federal would provide full coverage under the Federal Umbrella Policies upon exhaustion of the Great Northern Primary Policies. Brandywine also provided Wilfley with a coverage chart showing the state of exhaustion of the Great Northern Primary Policies and including all of the Federal Umbrella Policies under the heading "Aggregate Impairment Summary." Wilfley alleges that this chart confirmed Brandywine's verbal assurances that coverage would continue under the Federal Umbrella Policies upon exhaustion of the Great Northern Primary Policies. *Id.* ¶ 40.

Wilfley further alleges that, in reliance on Brandywine's assurances, Wilfley invested in new facilities, technologies, and products in order to remain in business and continue to provide jobs. Wilfley alleges that it would not have made those investments if it had reason for concern that Federal and Brandywine would not honor their promise that the Federal Umbrella Policies would provide full coverage immediately upon the exhaustion of the Great Northern Primary Policies. *Id.* ¶ 41. On July 12, 2019, Wilfley wrote to Brandywine: "If Wilfley should not be relying upon your assurances that CHUBB will pay in full . . . please let us know immediately so Wilfley can reassess its

---

[2] Wilfley alleges that Brandywine is an affiliate of Federal and was authorized to make claim determinations for Federal.

expansion plans." *Id*. ¶ 42.[3] Wilfley never received a response to its July 12, 2019 email and claims that it reasonably relied upon Brandywine's prior assurances that full coverage would be provided. *Id*. ¶ 43. By emails in February 2020, April 2021, and November 2022, Brandywine again allegedly provided Wilfley with charts, titled "Aggregate Impairment Summaries," again listing all the Federal Umbrella Policies, which caused Wilfley to further reasonably rely upon Brandywine's assurances. *Id*. ¶ 45. Wilfley alleges that it was not until the last of the solvent underlying policies neared exhaustion in early 2023 that Brandywine first informed Wilfley of Federal and Brandywine's position that the Federal Umbrella Policies ***do not*** provide any defense coverage and that Federal would not pay indemnity coverage in full upon the exhaustion of primary coverage. *Id*. ¶ 46.

In light of the exhaustion of the Great Northern Primary Policies and the insolvency of the other scheduled primary insurers, Wilfley filed this lawsuit seeking defense and indemnity coverage from Federal for claims that would have been covered by scheduled underlying primary policies but for the insolvency. ECF No. 34 ¶¶ 83–104 (Claims 5 through 8 for breach of contract, declaratory relief, estoppel, and common law insurance bad faith). Wilfley argues that even if the terms of the Federal Umbrella Policies do not provide for coverage, Federal should be estopped from denying full defense and indemnity coverage for the Underlying Actions up to the full limits of the Federal Umbrella Policies.

Federal brings three counterclaims against Wilfley. In Counterclaims 1 and 2, Federal seeks declarations that: 1) Federal's duty to defend Wilfley is not triggered by

---

[3] Wilfley alleges that CHUBB is the prior owner of Great Northern and Federal.

the insolvency of scheduled underlying primary insurance, and 2) Federal's duty to indemnify is not triggered until the applicable underlying primary policy limits have been exhausted. ECF No. 44 ¶¶ 13–24. In Counterclaim 3, Federal seeks recoupment of defense and indemnity payments paid on Wilfley's behalf in connection with uncovered claims at issue in the Underlying Actions. *Id.* ¶¶ 25–31.

Federal now seeks judgment on the pleadings with respect to all of Wilfley's claims against Federal and all Federal's counterclaims against Wilfley. ECF No. 70 at 2. Federal argues that the plain language of the Federal Umbrella Policies provides that Federal's duty to defend and indemnify is triggered only when (1) the limits of the scheduled underlying primary insurance have been exhausted via payment; or (2) the alleged damages are covered by the terms and conditions of the Federal Umbrella Policies *but not* by those of the scheduled underlying primary insurance. *Id.* at 1. The essential question is whether Federal is obligated under the Federal Umbrella Policies to step down into the shoes of the now insolvent primary insurers and provide to Wilfley (1) a defense in the Underlying Actions, and (2) the first-dollar indemnity that the now-insolvent primary insurers would have otherwise provided.

## II.    LEGAL STANDARDS

### a.  Motion for Judgment on the Pleadings

"'A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6).'" *Cummings v. Dean*, 913 F.3d 1227, 1238 (10th Cir. 2019) (citation omitted). Therefore, in ruling on a motion for judgment on the pleadings, courts look to the specific allegations of the complaint to determine whether they plausibly support a legal claim for relief—that is, a complaint must include "'enough

facts to state a claim for relief that is plausible on its face.'" *TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1236 (10th Cir. 2007) (citation omitted); *see also Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007). The Court accepts as true the well-pleaded factual allegations in the Amended Complaint and views them in the light most favorable to Wilfley as the nonmoving party. *See Nelson v. State Farm Mut. Auto. Ins. Co.*, 419 F.3d 1117, 1119 (10th Cir. 2005). To satisfy its burden on a motion for judgment on the pleadings, "the moving party must show that 'no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'" *DTC Energy Grp., Inc. v. Hirschfeld*, No. 17-CV-01718-PAB-KLM, 2020 WL 1333090, at *3 (D. Colo. Mar. 23, 2020) (citation omitted).

The Court here considers a motion for judgment on the pleadings with respect to claims in the operative complaint as well as counterclaims. In ruling on such a motion, the Court may consider Wilfley's Amended Complaint and its attachments, ECF No. 34, Federal's Answer and Counterclaims and its attachments, ECF No. 44, and Wilfley's Answer to Federal's Counterclaims, ECF No. 50. *See Park Univ. Enters. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006); *Nau Holdings, LLC v. Dlorah*, Inc., No. 08-cv-02743-CMA-BNB, 2010 WL 447393, at *3 (D. Colo. Feb. 3, 2010). Additionally, the Court may take judicial notice of court documents. *Denver Health & Hosp. Auth. v. Beverage Distrib. Co., LLC*, 546 F. App'x 742, 747 n.3 (10th Cir. 2013).

### b. Interpretation of Insurance Contracts

In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to "'ascertain and apply the state law.'" *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir.

2003) (quoting *Huddleston v. Dwyer*, 322 U.S. 232, 236 (1944)). The federal court must follow the most recent decisions of the state's highest court. *Id.* "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *Id.*; *see also Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1132 (10th Cir. 2002) ("[W]here jurisdiction rests solely on diversity of citizenship and there is no controlling decision by the highest court of a state, a decision by an intermediate court should be followed by the Federal court, absent . . . convincing evidence that the highest court of the state would decide otherwise.") (quotation marks and citation omitted).

When interpreting an insurance policy, Colorado courts apply principles of contract interpretation. *Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 340 (Colo. 2004). In Colorado, a contract is interpreted according to the plain and ordinary meaning of its language. *Chacon v. Am. Fam. Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990). A court should enforce the insurance contract as written, unless an ambiguity exists. *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1359 (Colo. 1993). "In determining the plain and ordinary meaning of a term in an insurance policy, the Colorado Supreme Court has eschewed the use of 'technical readings' and instead looks to 'what meaning a person of ordinary intelligence would attach to' a policy term." *Sullivan v. Nationwide Affinity Ins. Co. of Am.*, 842 F. App'x 251, 254 (10th Cir. 2021) (quoting *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1051 (Colo. 2011)). A court's construction of policy provisions must be "fair, natural and reasonable rather than strained or strictly technical." *Vill. Homes of Colorado, Inc. v. Travelers Cas. & Sur. Co.*, 148 P.3d 293, 296 (Colo. App. 2006), *aff'd*, 155 P.3d 369 (Colo. 2007) (internal quotation marks and citation omitted).

Colorado courts honor "the doctrine of reasonable expectations." *Bailey*, 255 P.3d at 1048. "Courts should not rewrite insurance policy provisions that are clear and unambiguous." *Vill. Homes of Colo., Inc.*, 148 P.3d at 296. "If, based on how an ordinary, objectively reasonable insured would read the policy, the question of whether certain coverage exists is susceptible to more than one reasonable interpretation, then the coverage provisions are ambiguous and must be construed against the insurer as the drafter of the policy." *Todd v. USAA Gen. Indem. Co.*, 713 F. Supp. 3d 1088, 1098 (D. Colo. 2024) (internal quotation marks and citations omitted).

Where the Colorado Supreme Court has not interpreted the language of a particular insurance provision, this Court may rely on legal interpretations of similar issues, cases from other jurisdictions, and from Colorado's lower courts as persuasive authority in evaluating and resolving potential coverage questions. *See Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007).

III.    **ANALYSIS**

   a.  **Relevant Language in the Federal Umbrella Policies is Undisputed**

As an initial matter, the Court addresses Wilfley's argument in opposition to Federal's Motion for Judgment on the Pleadings that there is some uncertainty about the exact language of the Federal Umbrella Policies, in part because two of those policies have not been located. *See* ECF No. 76 at 3 (arguing that "[t]he number of policies, and the terms and conditions of the policies, are disputed issues of fact"). Wilfley argues that Federal issued five policies, and not just the three policies that it acknowledges. *Id*. Wilfley further disputes the contents of the Federal Umbrella Policies, claiming that that Court cannot rely on Federal's business records affidavit of Donald E.

Brown, ECF No. 44-1 at 2–3, and the accompanying specimen of the insuring agreements provided with that affidavit, *id.* at 6–12.

The Court agrees with Federal with respect to the number of Federal Umbrella Policies and their contents. Both Federal and Wilfley appear to agree that there were five policies issued by Federal to Wilfley. ECF No. 76 at 4 n. 1. In addition, the critical language of these policies is not in dispute. The Court has no reason to question the specimen form policy attached to Mr. Brown's affidavit, in which he attests that the specimen was the form issued as part of Federal umbrella liability policies during the relevant time period, 1981 to 1986. ECF No. 44-1 at 2–3. Indeed, Wilfley's Amended Complaint attaches the same specimen form, *see* ECF No. 34-3, and recites the same relevant policy language, *id.* ¶¶ 33–34. If Wilfley had a different view as to the contents of the Federal Umbrella Policies, it should have alleged as much and should not have attached Federal's specimen to its Amended Complaint or quoted from its language. For purposes of the Federal's Motion for Judgment on the Pleadings, the Court finds the policy language to be undisputed and accurately reflected in the "specimen" form, ECF No. 34-3.

### b.  Whether the Federal Umbrella Policies Require "Drop Down"

#### i.  Federal's Arguments

Federal argues that the insolvency of an underlying insurance carrier (and the associated inability to collect from that carrier) is not enough to trigger coverage under the Federal Umbrella Policies. This is because, in Federal's view, neither of the triggering events under the Federal Umbrella Policies has occurred: (1) the limits of the underlying primary insurance *have not been exhausted via payment*, and (2) the alleged

damages *are covered* by the scheduled underlying primary insurance. Federal argues that Wilfley's inability to collect due to the insolvency of an underlying primary insurer is not enough to trigger payment under the Federal Umbrella Policies. Per Federal, in arguing that the Federal Umbrella Policies have been triggered, Wilfley is conflating the terms, "covered" and "collectible." ECF No. 70 at 7. Federal argues that Wilfley's position is "contrary to the plain and unambiguous language of the Federal Umbrella Policies" because the term "covered" is not ambiguous. ECF No. 70 at 7. In Federal's view, the word "covered" refers to "the scope of the underlying coverage" and "not payment by the underlying primary insurer." ECF No. 70 at 7. In Federal's view, the words "covered" and "collectible" mean two distinctly different things.

Federal also emphasizes that the Federal Umbrella Policies further provide that "[c]overage under this policy shall not apply unless and until the 'insured,' or the 'insured's' underlying insurer, shall be obligated to pay the amount of the 'underlying limit' or 'retained limit'[.]" ECF No. 44-3 at 5. Because the asbestos bodily injury claims are covered by the scheduled underlying primary insurance, regardless of the solvency of the underlying primary insurers, in Federal's view, indemnity coverage under the Federal Umbrella Policies is triggered solely by exhaustion of the "underlying limits." *See* ECF No. 70 at 9.  And, to date, the "underlying limits" have not been exhausted.

The questions raised by Federal's Motion for Judgment on the Pleadings address the allocation of risk in the Federal Umbrella Policies. In issuing the Federal Umbrella Policies, Federal was agreeing to cover the risk to Wilfley (a) of liabilities *not covered* by the Great Northern Primary Policies and other underlying policies, and (b) that the lower layer of insurance (the Great Northern Primary Policies and other underlying policies)

would be exhausted by payment of covered liabilities. Here, the Court must decide whether Federal was *also* accepting the risk of the underlying primary insurers becoming insolvent. *See, e.g.*, *Prince Carpentry, Inc. v. Cosmopolitan Mut. Ins. Co.*, 479 N.Y.S.2d 284, 292–93 (Sup. Ct. 1984) (holding that an excess policy was triggered by "exhaustion" of the underlying policy only by reason of losses paid thereunder, and "[c]atastrophic policy though it may be, the excess insurer is not insuring against the insolvency of the primary insurer"); *Cont'l Marble & Granite v. Canal Ins. Co.*, 785 F.2d 1258 (5th Cir. 1986) (holding that primary insurer's insolvency did not render the primary insurance "inapplicable" to an occurrence covered by the terms of the primary policy, explaining that "[i]mposing the duty of indemnification on [the excess insurer] would, in effect, transmogrify the policy into one of guaranteeing the solvency of whatever primary insurer the insured might choose"); *Canal Ins. Co. v. Montello, Inc.*, No. 10-CV-411-JHP-TLW, 2013 WL 6732658 (N.D. Okla., Dec. 19, 2013) at *5 (surveying numerous decisions from multiple jurisdictions and consulting multiple secondary sources before concluding that "the majority of the courts that have confronted the issue hold that when a primary insurer becomes insolvent, the excess insurer is not required to 'drop down' to assume the primary carrier's coverage obligations") (quoting Barry S. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes §§ 13.03, 13.12 at 875–78 and 900–07 (7th ed. 1994), *aff'd* 632 Fed. App'x 448 (10th Cir. 2015)).

### ii.  Wilfley's Argument

Wilfley argues that under the "plain language" of the Federal Umbrella Policies, Federal *must* drop down to fill the void left by insolvent underlying primary insurers. *See*

ECF No. 76 at 4. Wilfley relies on the following language in the "Insuring Agreement" section and "Defense Provisions" subsection (sections 4(a) and 4(a)(b)):

> With respect to any occurrence *not covered by the underlying policies listed in the schedule of underlying insurance, or any other underlying insurance collectible by the insured*, but covered by the terms and conditions of this policy the Company shall, in addition to the amount of ultimate net loss payable; . . . defend any suit against the insured seeking damages on account of personal injury . . . .

ECF No. 34-3 at 2–3 (emphasis added). In Wilfley's view, the emphasized language "groups together all underlying policies which cannot be called upon to pay a claim because the insurance is uncollectible." ECF No. 76 at 5. Wilfley argues that this is why the policy uses the phrase "or any other underlying insurance *collectible* by the insured." ECF No. 34-3 at 2–3 (emphasis added). Per Wilfley, the Federal Umbrella Policies must therefore provide 100% first-dollar defense and indemnity coverage in the absence of any "collectible underlying insurance." ECF No. 76 at 5. According to Wilfley, this interpretation comports with the reasonable expectations of a policyholder who purchased broad umbrella coverage, rather than a pure excess policy. The policyholder would expect its umbrella policy to provide coverage when there was no underlying coverage for any reason, because "the distinguishing feature of an umbrella policy is that it drops down to fill gaps in the policyholder's protection." *Id.* (citing *Mid-Continent Cas. Co. v. Circle S Feed Store*, LLC, 754 F.3d 1175, 1179 (10th Cir. 2014), for the proposition that umbrella policies are different from excess policies because they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage)). According to Wilfley, a reasonable policyholder would not expect the insolvency of a scheduled underlying policy to prevent

a drop down of the umbrella policy but at the same time require drop down if some other (albeit unscheduled) underlying insurance is insolvent. ECF No. 76 at 6.

Wilfley cites one Colorado case in support of its position. In *Deisch & Marion, P.C. v. International Insurance Co.*, 771 P.2d 19, 20 (Colo. App. 1989), the Colorado Court of Appeals affirmed an unjust enrichment award against an excess insurer for attorneys fees incurred in the defense of the insured. The law firm had been retained by the underlying carrier to defend the insured, but then the underlying carrier had become insolvent. The law firm had expended time defending the insured, but the insolvency of the underlying carrier meant the law firm was not getting paid. It sued the excess/umbrella carrier, which had benefited from the legal services provided. The excess policy language in *Deisch* was similar to the critical language in the instant case:

> With respect to any occurrence not covered, as agreed, by the underlying policies listed in Schedule A hereof or not covered by any other underlying insurance collectible by the insured, but covered by the terms and conditions of this policy except for the amount of retained limit specified in Item 4(C) of the declarations, the company shall: (a) defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient.

*Id.* The *Deisch* court ultimately found that because of the insolvency of the underlying (primary) carrier, the underlying insurance was not "collectible by the insured," at least for purposes of paying defense costs. *Id*. Thus, the Court concluded that by the policy's "very terms," the insurance contract "provides that [the excess carrier] had a duty to defend. *Id*. Although this case purports to be an interpretation of the terms of the contract, the contract interpretation language arguably constitutes dicta, because the decision was, at base, an unjust enrichment/quasi-contract case where the court

ultimately found "it would be inequitable to permit [the excess insurer] to have the benefit of the defense provided by [the law firm] without paying for it." *Id*.

### iii.  Court's Analysis

To the extent that Federal's Motion for Judgment on the Pleadings requires interpretation of the language of the Federal Umbrella Policies, the Colorado Supreme Court has not interpreted the specific disputed language. Therefore, this Court may rely on legal interpretations of similar issues, cases from other jurisdictions, and from Colorado's lower courts as persuasive authority in evaluating potential coverage for the asbestos bodily injury suits under the Federal Umbrella Policies. Also to be considered is "'the general weight and trend of authority' in the relevant area of law." *See Wade*, 483 F.3d at 666 (quoting *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1262 (10th Cir. 2006)).

The Court concludes that Federal's interpretation of the disputed Federal Umbrella Policies language is correct, and that the insolvency of the underlying scheduled insurers does not trigger Federal's obligation to defend the underlying lawsuit or to pay indemnity until the underlying limits have been exhausted (or paid by Wilfley). The Court comes to this conclusion based on the language of the Federal Umbrella Policies and relevant caselaw interpreting similar language.

As noted above, Wilfley seeks to rely on a particular section of the Federal Umbrella Policies' language which states that Federal should pay the ultimate amount of net loss and provide a defense with respect to any occurrences "not covered by the underlying policies listed in the schedule of underlying insurance, or any other underlying insurance collectible by the insured, but covered by the terms and conditions

18

of this policy." ECF No. 34-3 at 2–3. Under Wilfley's interpretation, the word "collectible" applies not just to some other insurance that Wilfley might have that is not listed on the schedule of underlying insurance, but also to occurrences that *are covered* by the schedule of underlying insurance *but are not collectible*. This is inconsistent with the written language of the policy. There is a comma between the clause, "not covered by the underlying policies listed in the schedule of underlying insurance" and the clause, "or any other underlying insurance collectible by the insured." The word "collectible" does not modify or limit the language in the clause before the comma.

As the Court interprets this language, Federal does not have to provide a defense for or pay the ultimate amount of net loss for claims that are covered by the underlying scheduled policies, or are covered by any other (non-scheduled) valid insurance policies that might be collectible. Nowhere in the plain reading of this section does it suggest that Federal might have to provide a defense for, or provide first-dollar coverage for, a claim that *is covered* by the underlying scheduled insurance but *is not collectible*.

This interpretation is consistent with the other provisions of the policy. For example, the section relating to the "Payment of Ultimate Net Loss" says that "[c]overage under this policy shall not apply unless and until the insured, or the insured's underlying insurer, shall be obligated to pay the amount of the underlying limit or retained limit on account of personal injury, property damage or advertising liability." ECF No. 34-3 at 4–5. Once the "ultimate net loss has finally been determined," Federal shall "promptly pay on behalf of the insured the amount of ultimate net loss falling within the terms of this policy." *Id.* This language fits Federal's view that it need not pay out on

the umbrella coverage unless or until either Wilfley or its underlying insurer pays the

amount of the underlying or retained limit. The underlying insurer's insolvency (without

the underlying limit having been exhausted via payment) is not an event that triggers

Federal's obligation to pay.

The Court's interpretation is also consistent with the other mention of the word

"collectible" in the Federal policy. One listed condition specifically refers to "Other

Insurance:"

> If *other valid and collectible insurance with any other insurer* is available to
> the insured covering a loss also covered by this policy, other than insurance
> that is in excess of the insurance afforded by this policy, the insurance
> afforded by this policy shall be in excess of and shall not contribute with
> such other insurance.

ECF No. 34-3 at 4 (emphasis added). This provision makes clear that if Wilfley had

procured any *other* insurance beyond the scheduled underlying insurance, and that

insurance was valid *and collectible*, then Federal's policy would be in excess of that

other insurance. But there was no requirement that Wilfley procure other insurance

beyond the scheduled underlying insurance, and it is reasonable to assume that

Federal was not incorporating the existence of any other unspecified insurance into its

underwriting of its policy premiums. Insolvency of the *other* insurer or insurers would

make that other insurance uncollectible, and Federal would still be obligated to pay its

excess or umbrella obligations. But collectability is not mentioned in connection with the

underlying scheduled insurance.

Other courts have come to the same conclusion when interpreting similar

language. For example, in *Mission National Insurance Co. v. Duke Transportation Co.*,

792 F.2d 550, 553 (5th Cir. 1986), the Fifth Circuit held that, under Louisiana law, the

excess insurer was not obligated to provide primary coverage or to defend the insured

as a result of the primary insurance carrier becoming insolvent. The court there stated,

> When an excess insurer uses the term "collectible" or "recoverable" it is
> agreeing to drop down in the event the primary coverage becomes
> uncollectible or unrecoverable; on the other hand, when an excess insurer
> uses the term "covered" or "not covered," it is agreeing to drop down only in
> the event that the terms of the underlying policy do not provide coverage for
> the occurrence or occurrences in question.

*Id.* In the instant case, the Federal policy uses the term "collectible" only to refer to

"other" insurance besides the scheduled underlying insurance.

Similarly, in *Radar v. Duke Transportation Inc.*, 492 So.2d 532, 535–36 (La. App.

1986), the court interpreted language nearly identical to the language to the Federal

Umbrella Policies and concluded that an excess policy did not require the excess

insurer to defend an action after the primary insurer's insolvency. This was because the

excess insurer owed the insured a defense only "if [the insolvent] underlying insurance

policy does not provide coverage for the specific occurrence *or* if the occurrence is not

covered by any *other* collectible insurance." *Id*. at 535. The court there found that the

word "or" separating the two conditions was "a disjunctive conjunction setting apart the

two mutually exclusive alternatives." *Id.* And because the underlying insurance policy

*did* provide coverage for the occurrence giving rise to the lawsuit, the excess insurer

was relieved of the duty to defend the insured. *Id*. Per the "plain and ordinary meaning

of the [excess] policy," the excess insurer's "duty to defend does not arise in the instant

case where the accident at issue is covered by the underlying insurance policy . . . ,

irrespective of [the underlying insurer's] insolvency." *Id*. at 536.

And, in *United States Fire Insurance Co., Inc. v. Capital Ford Truck Sales, Inc.*,

355 S.E.2d 428 (Ga. 1987), the Supreme Court of Georgia, also interpreting similar

policy language, addressed the precise issue in question here—whether an excess or umbrella carrier is required to provide first-dollar coverage to the insured, and to defend an action against an insured, if the primary insurer has become insolvent. The court there found the near identical provision "requires other underlying insurance to be 'collectible,' but does not so specify with respect to the underlying policy." *Id*. at 433. The court held:

> [S]ince this excess-insurance policy repeatedly distinguishes between the underlying insurance policy and other insurance, and since it repeatedly states that other insurance must be collectible, but does not so state with respect to the underlying insurance—the insolvency of the underlying insurer does not require the excess insurer to defend the insured in an action resulting from an occurrence covered by the underlying insurance policy, or to provide first-dollar coverage with respect to such occurrence.

*Id*.

Under the language of the instant policy, Federal would never have reasonably expected that it would have to drop down and provide first-dollar coverage in the event the underlying scheduled insurance was not collectible. And no reasonable insured would read the policy to require Federal to drop down and provide first-dollar coverage. The "Maintenance of Underlying Insurance" provision of the Federal Umbrella Policies confirms this reading, as it requires that that the scheduled underlying insurance "be maintained in full effect during the currency of this policy." ECF No. 34-3 at 4. Critically, the failure to comply with that provision would not invalidate the contract, "but in the event of such failure," Federal would only be liable to the "same extent as if the insured had complied with this condition." *Id*. Thus, if Wilfley had never procured or maintained the scheduled underlying insurance, although the excess insurance would not become void, Wilfley itself would be on the hook for the obligations expected from the primary

insurers. Nothing about this provision, or any other aspect of the Federal Umbrella Policies, suggests that Federal would ever be required to drop down and pay first-dollar coverage or for Wilfley's defense for risks covered by the scheduled underlying insurance.

Thus, reading the policy as a whole and using the doctrine of reasonable expectations, as the Court is required to do, *see Bailey*, 255 P.3d at 1051, no ordinary insured could reasonably read the Federal Umbrella Policies to mean that, in the event of the insolvency of the scheduled underlying insurers, Federal would be required to drop down and step into the shoes of the insolvent insurers, both in providing a defense and paying first-dollar indemnity. "This court will not reach a strained interpretation of a contract, especially when the interpretation runs counter to the obvious intentions of the parties." *Scott's Liquid Gold, Inc. v. Lexington Ins. Co.*, 293 F.3d 1180, 1187 (10th Cir. 2002) (citing *Allstate Ins. Co. v. Starke*, 797 P.2d 14, 17–18 (Colo. 1990)).

To the extent that the Colorado Court of Appeals came to a different conclusion in *Deisch* by requiring an excess insurer to pay the legal fees of defense counsel after a primary insurer had gone insolvent, the Court finds that opinion unpersuasive. *See Dullmaier v. Xanterra Parks & Resorts*, 883 F.3d 1278, 1283–84 (10th Cir. 2018) (when applying state law, federal court should follow opinion of state intermediate appellate court unless "convinced by other persuasive data that the highest court of the state would decide otherwise"). First, *Deisch* focused primarily on the principles of unjust enrichment, implied contract, and the unfairness of allowing the excess insurer to get the benefit of the law firm's work without paying for it. In particular, the Court held:

> Thus, the only factor which, being an issue of equity, we may review is whether, under the circumstances of this case, it would be inequitable for

> [the excess insurer] to retain the benefit of the law firm's work product without paying for it and for the law firm to have performed the services without compensation from anyone.

771 P.2d at 20. Second, the opinion is very short and made no effort to review other provisions of the policy at issue there, so it cannot be said that the Court in *Deisch* was "reading the policy as a whole" in its interpretation of the critical coverage language. Third, the *Deisch* decision also did not review the general trend in the law that, absent specific language to the contrary, an excess policy does not drop down in the event of the insolvency of the underlying carrier.

The Court observes that "the general weight and trend of authority" in this area of the law supports the conclusion that Federal is not required to drop down to replace the insolvent primary insurers. *See Wade*, 483 F.3d at 666. The vast majority of cases that have considered this issue conclude that an excess or umbrella insurer does not drop down to cover the obligations of an insolvent primary insurer, absent policy language to the contrary. This trend is explained in detail in *Montello,* which, although it was interpreting Oklahoma law, gives a good survey of cases from other jurisdictions concluding that, absent an intent in an excess policy to do so, when a primary insurer becomes insolvent, the excess insurer is not required to assume the primary insurer's coverage obligations. 2013 WL 6732658 at *5–6 (citing treatises and collecting cases from Texas, Illinois, North Carolina, Missouri, Louisiana, Wisconsin, West Virginia, Mississippi, Maryland, Illinois, Alabama, Massachusetts, Pennsylvania, Georgia, Michigan and New York). This general view is consistent with the principle that an excess insurer's obligations are not triggered until the primary coverage limits have been exhausted. Requiring the excess insurer to provide coverage prior to the

exhaustion of the primary coverage limits would improperly "reallocat[e] risks that the parties had freely agreed to and had been compensated to assume." *Id*. at *6 (quoting *U.S. Fid. & Guar. Co. v. Federated Rural Elec. Ins. Corp.*, 37 P.3d 828, 833 (Okla. 2001)). As the Fifth Circuit explained in rejecting the same "drop down" argument that Wilfley makes here, Wilfley's "proposed rule would require insurance companies to scrutinize one another's financial wellbeing before issuing secondary policies. The insurance world is complex enough; to impose this additional burden on companies such as [the umbrella carrier] would only further our legal system's lamentable trend of complicating commercial relationships and transactions." *Cont'l Marble & Granite*, 785 F.2d at 1259; *see also Montello*, 632 Fed. App'x at 453 (explaining that "[it] is common for courts to hold that excess insurers have no obligation to drop down, even when the contract does not expressly prohibit it").

In contrast to the great weight of authority cited by Federal supporting the view that insolvency of the primary insurer should not require an excess insurer to cover the insolvent primary's obligations, Wilfley, in its briefing, cited little to no authority explaining why a contrary rule should prevail. Instead, Wilfley's argument relies almost exclusively on a strained interpretation of the language of the policy and the holding in *Deisch*, neither of which are persuasive.

### c.  Wilfley's Estoppel Claim

Wilfley argues that Federal should be estopped from denying coverage based on representations that Federal and Brandywine previously made and on which Wilfley relied.

The general rule in Colorado is that estoppel cannot create coverage for risks falling outside an insurance policy. *See Evanston Ins. Co. v. L. Off. of Michael P. Medved, P.C.*, 890 F.3d 1195, 1200 (10th Cir. 2018). As the Colorado Supreme Court has held: "The rule is well established that the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom . . . ." *Hartford Live Stock Ins. Co. v. Phillips*, 372 P.2d 740, 742 (Colo. 1962) (citation omitted).

> There are certain important limitations upon the extent of the applicability of the doctrines of waiver and estoppel as against an insurer, and as far as the doctrines are based upon the conduct or action of the insurer, as a rule they are not available to bring within the coverage of a policy risks not covered by its terms or risks expressly excluded therefrom.

44A Am. Jur. 2d Insurance § 1508. In *Evanston*, the Tenth Circuit explained that a narrow exception to this limitation on estoppel exists when the following three criteria are met: "(1) the insurer knew of the noncoverage; (2) the insurer assumed defense of the action without a reservation of rights; and (3) the insured relied to its detriment on the insurer's defense." *Evanston*, 890 F.3d at 1200–01 (citing *Mgmt. Specialists, Inc. v. Northfield Ins. Co.*, 117 P.3d 32, 37–38 (Colo. App. 2004)).

Here, Federal argues that because it agreed to defend under a reservation of rights, there can be no estoppel as a matter of law. According to Federal, the fundamental principle of Colorado law is that "estoppel, based upon the conduct or action of the insurer, [is] not available to bring within coverage of a policy risks not covered by its terms." *McGowan v. State Farm Fire & Cas. Co.*, 100 P.3d 521, 526 (Colo. App. 2004); *see also Empire Cas. Co. v. St. Paul Fire & Marine Ins. Co.,* 764

P.2d 1191, 1198 (Colo. 1988) (holding that estoppel "cannot have created liability where none existed under the policy"). In Federal's view, by seeking to have Federal "drop down" and provide a defense and/or indemnity before it would otherwise be required to under the policy, Wilfley is improperly seeking to use the doctrine of estoppel to create "liability where none existed under the policy."

Wilfley, for its part, argues that estoppel should apply in these circumstances and that the *Evanston* reasoning is inapplicable. *See* ECF No. 76 at 15. Wilfley argues that the issue is not whether Federal issued a reservation of rights letter, but whether Federal, long before, had made statements to Wilfley about how it was interpreting the Federal Umbrella Policies as providing coverage upon the exhaustion of the Great Northern Primary Policies. Based on these statements, Wilfley says it made business investments when it otherwise would have saved the money in anticipation of having to defend the Underlying Actions. In Wilfley's view, "[s]uch affirmative action [by Federal] is fundamentally different than the inaction of an insurer which fails to advise the insured of the policy provisions upon which it believes it can question coverage – the predicate conduct for the *Evanston* decision and the cases it cites, as well as its progeny." *Id*. Wilfley insists that (1) the facts alleged must be read in the light most favorable to Wilfley and (2) it has alleged that Federal knew all the necessary facts (including about the insolvency of certain scheduled underlying insurers) when it stated to Wilfley that the Federal excess policies would kick in once the Great Northern Primary Policies were exhausted—making estoppel (or waiver) appropriate here.

In support for its position, Wilfley relies on dicta from a footnote in a 1992 decision by the Colorado Supreme Court, *United States Fidelity & Guaranty Co. v.*

*Budget Rent-A-Car Systems, Inc.*, 842 P.2d 208 n.3 (Colo. 1992). That case involved a fight between two insurers about which one was the primary insurer after an accident. The Colorado Supreme Court noted in its footnote that "[a]n insurer should raise (or at least reserve) all defenses within a reasonable time after learning of such defenses, or those defenses may be deemed waived or the insurer may be estopped from raising them." *Id*. But this articulated rule is not inconsistent with the rule in *Evanston*. And it provides no succor for Wilfley. Even accepting the truth of Wilfley's allegations, the general principle is that estoppel cannot extend the breadth of coverage in a policy. Here, as soon as the Federal Umbrella Policies were to have kicked in (under Wilfley's theory), Federal provided a defense via the Reservation of Rights letter. To base an estoppel claim on the the fact that *before* its coverage obligations arguably became ripe, some of Federal/Brandywine's communications suggested that Federal would provide coverage once the Great Northern Primary Policies were exhausted, runs counter to the rule in Colorado that estoppel cannot extend coverage not provided for in a policy. Wilfley's briefing provides no authority for the proposition that, in Colorado, the doctrine of estoppel can be used to expand coverage not specifically contemplated in the policy where there has been a reservation of rights. Because Federal provided a defense subject to a reservation of rights, Wilfley's estoppel claim fails.

## IV.    CONCLUSION

Based on the above analysis, I conclude the following with respect to Wilfley's claims against Federal (Claims 5 through 8) and Federal's counterclaims against Wilfley (Counterclaims 1 through 3).

### a. Wilfley's Breach of Contract Claim Against Federal (Claim 5)

Judgment should enter against Wilfley and in favor of Federal. Federal has not breached the Federal Umbrella Policies because the conditions necessary to trigger the Federal Umbrella Policies have not occurred.

### b. Wilfley's Declaratory Relief Claim Against Federal (Claim 6)

Judgment should enter against Wilfley and in favor of Federal. Contrary to Wilfley's assertions, Federal is not obligated to provide coverage for future Underlying Actions under the Federal Umbrella Policies (absent additional conditions being met), and Federal will be entitled to recoup from Wilfley the fees and costs that Federal has paid in the Underlying Actions.

### c. Wilfley's Estoppel Claim Against Federal (Claim 7)

Judgment should enter against Wilfley and in favor of Federal. The general rule is that estoppel cannot be used to extend coverage under an insurance policy and the limited exception to this rule does not apply.

### d. Wilfley's Common Law Insurance Bad Faith Claim Against Federal (Claim 8)

Judgment should enter against Wilfley and in favor of Federal. There was no underlying breach of contract and, as of now, Federal has no obligation to defend or pay indemnity to Wilfley. As a result, there can be no bad faith as a matter of law.

### e. Federal's Counterclaim 1 Against Wilfley (Declaratory Relief – "No Defense Obligation Is Owed as a Result of an Underlying Insurer Being Insolvent")

Judgment should enter against Wilfley and in favor of Federal on Federal's request for a declaratory judgment that Federal owes no defense obligation to Wilfley in

connection with the Underlying Actions as a result of the underlying insurer(s) being insolvent.

### f. Federal's Counterclaim 2 Against Wilfley (Declaratory Relief – "No Indemnity Obligation Is Owed Under the Federal [Umbrella] Policies Because the Underlying Limit or Retained Limit Has Not Been Exhausted")

Judgment should enter against Wilfley and in favor of Federal on Federal's request for a declaratory judgment that Federal, to date, has no indemnity obligation to Wilfley merely as a result of the underlying insurer(s)' insolvency. The Court concludes that Federal may have an indemnity obligation to Wilfley in the event that Wilfley itself pays the limits of liability listed in the schedule of underlying insurance. In other words, the insolvency of the underlying insurer does not completely relieve Federal of all indemnity liability for all time. The Federal Umbrella Policies specifically provide that Federal "shall be liable only for the ultimate net loss the excess of the greater of the insured's underlying limit or retained limit." ECF No. 34-3 at 2.

Federal may be liable for indemnity consistent with the language of the "Maintenance of Underlying Insurance" condition, which provides that the failure to maintain underlying insurance does not invalidate the excess policy, "but in the event of such failure, [Federal] shall only be liable to the same extent as if the insured had complied with this condition." ECF No. 34-3 at 4. To hold otherwise would give Federal a windfall and the ability to avoid any indemnity obligation based on the insolvency of the underlying carriers. But because there is no allegation in the Amended Complaint that Wilfley itself has paid the underlying limit described in the Ultimate Net Loss section of the Federal Umbrella Policies, Federal has, to date, no indemnity obligation to Wilfley.

**g. Federal's Counterclaim 3 Against Wilfley (Monetary Damages – "Federal Is Entitled to Recoup from Wilfley Amounts Expended on Their Behalf in Connection with Uncovered Claims")**

As to Wilfley's liability to Federal for defense costs and indemnity paid to date, the Court agrees that, consistent with the Reservation of Rights Letter, Federal should be entitled to recoup its defense costs and any indemnity payments made to date. However, because there has been no evidence presented (and no allegations in the pleadings) as to the amount of money Federal has paid for defense costs or indemnity, the Court is not prepared to enter judgment on this claim at this time.

Dated at Denver, Colorado this 21st day of April, 2025

N. Reid Neureiter
United States Magistrate Judge